UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| v. | )    Criminal No. 19-cr-10421 <br> ) |
| JOSE RODRIGUEZ-GARCIA, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                              September 1, 2023

## I.     Introduction

Defendant Jose Rodriguez-Garcia ("Rodriguez-Garcia") has moved to suppress the fruits of a search and seizure of his vehicle and his statements to law enforcement on March 3, 2019. D. 281. Having considered the motion, D. 281, the supporting memorandum, D. 288, the government's opposition, D. 302, and the exhibits and affidavits attached to same as well as oral argument, D. 704, the Court DENIES the motion.

## II.    Factual Background

### A.     The Investigation Begins

In or around May 2017, agents with the Drug Enforcement Administration ("DEA") and the United States Postal Inspection Services launched a joint investigation into a suspected drug trafficking organization involved in the mailing of controlled substances from Puerto Rico to the New Bedford area. See D. 302-3 ¶ 8. The targets involved in the alleged distribution of controlled substances included co-defendant Yuen Liu-Torres ("Liu-Torres") and others. Id. ¶ 6. Agents

sought and received authorization to intercept wire and electronic communications over Liu-Torres's telephone and those of other targets, including for a period beginning on February 12, 2019.  Id. ¶¶ 10, 15–18.  As a result, agents intercepted a series of calls between Liu-Torres and Rodriguez-Garcia concerning the transport of suspected drug proceeds.  See D. 302-1.

On Wednesday, February 27, 2019, agents intercepted a call from Liu-Torres to Rodriguez-Garcia, in which Liu-Torres told Rodriguez-Garcia, "Bolo is asking if you can do a job." D. 302-1 at 4; D. 302-3 ¶ 26.  Rodriguez-Garcia asked, "On the weekend?" and Liu-Torres said, "for tomorrow."  D. 302-1 at 4; D. 302-3 ¶ 26.  Rodriguez-Garcia expressed reservations due to the weather ("[Bolo] has to check because it is going to snow") and Liu-Torres explained that Bolo was "in Puerto Rico."  D. 302-3 ¶ 26.  Liu-Torres said he would call Bolo and Rodriguez-Garcia added that he could "go on Friday and bring it quickly."  Id.  In a Title III affidavit, a DEA Task Force Officer concluded, based on his training, experience, and familiarity with this investigation, that Liu-Torres was telling Rodriguez-Garcia "that one of his suppliers ('Bolo') asked for Rodriguez-Garcia to transport drug money ('Bolo is asking if you can do a job') on Thursday, February 28, 2019 ('. . . for tomorrow'); that Rodriguez-Garcia said the weather would be bad that day ('Tell him that it is going to be snowing around here . . . tell him that tomorrow is going to be ugly.'); and that [he] suggested doing it the following day instead ('If he gives me time, I can go on Friday and bring it quickly')." Id. ¶ 27.

On Saturday, March 2, 2019, agents intercepted a call in which Liu-Torres told Rodriguez-Garcia "we are going to square up the money" so "you can take it so you can leave in the morning. You have to be there by 1:00 (pm) at the latest."  D. 302-1 at 6.  Liu-Torres added that Rodriguez-Garcia had to go to a "New York" address, to which Rodriguez-Garcia replied, "Alright."  Id. Later that day, Liu-Torres and Rodriguez-Garcia spoke again over phone to coordinate a meeting

in person.  Id. at 7–8.  Shortly after, agents intercepted a call between Liu-Torres and another individual in which Liu-Torres said in the background, "58 minus 500 . . . 57,500."  Id. at 9; D. 302-3 ¶ 30.

The next day, March 3, 2019, at approximately 8:00 a.m., agents surveilled Rodriguez-Garcia's residence in New Bedford.  D. 302-2 at 2–3.  At approximately 8:20 a.m., Rodriguez-Garcia walked out of his residence holding a red gift bag and placed it in the trunk of his vehicle, a gray 2004 Toyota Corolla (the "Corolla").  Id. at 3.  Agents observed the Corolla drive to the intersection of Cedar Street and North Street at 8:29 a.m., where a male, later identified as Jesus Velez ("Velez"), entered the front passenger seat.  Id.  The agents followed the Corolla as it traveled west on Interstate 195 through Massachusetts and Rhode Island and then south on Interstate 95 through Rhode Island and Connecticut.  Id.

### B. DEA Agents Coordinate with Connecticut State Police to Stop the Corolla

As the Corolla traveled through Connecticut, the DEA agents surveilling the vehicle contacted the Connecticut State Police ("CSP") and informed them of the ongoing wiretap investigation into Rodriguez-Garcia and the transport of suspected drug proceeds from New Bedford to New York in the Corolla.  Id.; D. 302-3 ¶ 33; D. 302-6 ¶ 8; D. 302-7 ¶ 4.  Agents also provided the CSP with updates as to the Corolla's location and asked them to initiate a traffic stop.  D. 302-7 ¶ 4.  Trooper Kalen Brown, a state trooper with the CSP, proceeded to Interstate 95 southbound and located the Corolla at approximately 9:45 a.m.  Id. ¶¶ 2, 5.  Trooper Brown observed that the Corolla had heavy tint on all four of the vehicle's door windows, including the driver and front seat passenger windows, and initiated a traffic stop.  Id. ¶ 5.

### C. Police Search the Corolla and Seize Marijuana and $57,673 in Cash

Trooper Brown approached the Corolla on the passenger side and spoke with Rodriguez-Garcia, who was driving through the window, asking him for his license and registration and telling him that he had been stopped because the heavy tint on the Corolla's windows was illegal. Gov't Exh. 3 at 02:13–02:48 (video recording of March 3, 2019 stop). Trooper Brown then asked whether Rodriguez-Garcia or Velez had been smoking marijuana and told them he could smell an odor of marijuana emanating from the vehicle. Id. at 02:48–02:51. One or both of the passengers confirmed that they had smoked marijuana earlier in the day. Id. at 02:51–02:55; D. 281-1 ¶ 5. After returning to the police cruiser, Trooper Brown approached the driver side of the Corolla as another officer stood by the passenger side; the officers asked Rodriguez-Garcia and Velez to step out of the vehicle. Gov't Exh. 3 at 05:29–05:49, 06:33. Rodriguez-Garcia and Velez stepped out of the Corolla and Trooper Brown pat-frisked them and asked them to sit in front of the police cruiser, which they did. Id. at 05:51–07:04. As another officer stood by Rodriguez-Garcia and Velez, Trooper Brown searched the passenger compartment of the Corolla and found two small plastic bags containing marijuana and a metal marijuana grinder. Id. at 07:07–08:15; D. 302-7 ¶ 12. Trooper Brown then searched the trunk of the Corolla, where he found a red gift bag containing $57,500 in cash, packed into bundles and separated into two clear ziploc bags. Gov't Exh. 3 at 09:10–10:37; D. 302-7 ¶ 12. When asked about the cash, Rodriguez-Garcia told officers that the money belonged to him, that it was his life savings and that he preferred not to keep his money in bank accounts, but with him. Gov't Exh. 3 at 10:23–11:07; D. 302-7 ¶ 13. Trooper Brown asked Rodriguez-Garcia if he had any other money in the Corolla and Rodriguez-Garcia confirmed there was money in a compartment by the steering wheel; Trooper Brown searched that

4

area, found an additional $173 in cash and placed it into the red gift bag. Gov't Exh. 3 at 12:39–12:55, 16:16–17:32; D. 302-7 ¶ 14.

The officers seized the $57,673 in cash, the marijuana and the marijuana grinder. D. 302-7 ¶¶ 14–15. Rodriguez-Garcia and Velez were permitted to return to the Corolla while the officers prepared citations. Gov't Exh. 3 at 21:20. Trooper Brown cited Rodriguez-Garcia for possession of less than one-half ounce of marijuana and for operating a motor vehicle with window tint without a permit and issued him a receipt for the seized cash. D. 302-7 ¶¶ 15–16. Officers transported the seized cash to a nearby CSP barracks, where DEA Special Agent Patrick Kelley took possession of it. D. 302-7 ¶ 17.

### D. Rodriguez-Garcia Communicates with Liu-Torres About the Stop

As Rodriguez-Garcia and Velez waited in the Corolla for the citations from the troopers, at approximately 10:22 a.m., agents intercepted a text message from Rodriguez-Garcia to Liu-Torres, stating "Baby, they stopped me because of the fucking tinted windows and they searched and took that. Now I have to fight this case." D. 302-1 at 10. Moments later, after the officers had let the Corolla drive away, Rodriguez-Garcia called Liu-Torres, stating, "[t]hose fuckers already let me go." Id. at 13. Liu-Torres responded, "Yes, they let you go but Bolo is very upset because he is asking why they didn't arrest you or anything. That this and that, he was bugging." Id. Rodriguez-Garcia replied, "I didn't do anything bad. They were nice to me. I didn't say anything bad or anything." Id. Liu-Torres then asked about "the money" and Rodriguez-Garcia said that "[t]hey told me that they have to take the money because I have to bring some proof." Id. Subsequently, Rodriguez-Garcia plead guilty to the citations issued by Trooper Brown and paid a fine of $236. See D. 302-5 at 1.

**III.     Procedural History**

On December 4, 2019, a grand jury returned a superseding indictment charging Rodriguez-Garcia with conspiracy to distribute and to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 846 (Count I) and money laundering conspiracy in violation of 18 U.S.C. § 1956(h) (Count IV).  D. 19 at 1–3, 8.  Rodriguez-Garcia has moved to suppress fruits of the search and seizure of the Corolla and statements made to officers on March 3, 2019 and seeks an evidentiary hearing on the same.  D. 281.  The Court heard oral argument on the motion on August 30, 2023 and took the matter under advisement.  D. 704.

**IV.     Discussion**

Rodriguez-Garcia argues the seized evidence should be suppressed because the stop and search of the Corolla was in violation of the Fourth Amendment to the United States Constitution.  D. 288 at 4–8, 12.  Rodriguez-Garcia seeks suppression of his statements to the officers on the grounds that he was not given Miranda warnings.  Id. at 8–12.  Rodriguez-Garcia also contends that the seizure of the $57,673 in cash was in violation of the Fourth Amendment and his rights under the 8th Amendment rights, as incorporated by the Due Process Clause of the Fourteenth Amendment.  Id. at 13–14.[1]

---

[1] In his motion to suppress, Rodriguez-Garcia asserts that the stop and search of the Corolla was "based on the defendant's race" and thus in violation of his "equal protection rights under the Eighth Amendment to the United State Constitution." D. 281 at 2. Rodriguez-Garcia does not cite any facts or legal authority to substantiate this claim. Id. His memorandum of law also includes no discussion as to the purported racial motivation for the stop. See D. 288. The Court cannot meaningfully analyze an argument that has not been developed by counsel. See, e.g., Lovern v. Astrue, CIV.A. 09-40098-TSH, 2011 WL 4621455, at *6 (D. Mass. Sept. 29, 2011) Thus, this contention, as raised and not developed on this record, does not warrant further discussion here.

A. **Connecticut Law Does Not Govern the Federal Suppression Analysis**

As an initial matter, the Court notes that Rodriguez-Garcia has raised several arguments under Connecticut law.[2] Specifically, Rodriguez-Garcia argues that Trooper Brown's stop of his vehicle was "pretextual in nature" and therefore "in violation of his state constitutional rights," D. 288 at 6–7, and that "[t]he [s]eizure of the money was unconstitutional under Connecticut law." Id. at 12.

Federal law controls in federal prosecutions. United States v. Sutherland, 929 F.2d 765, 769 (1st Cir. 1991). It is well-settled in the First Circuit that "the admissibility of evidence obtained during a joint federal-state investigation for use in a federal criminal trial is governed by federal law." United States v. Pratt, 913 F.2d 982, 987 (1st Cir. 1990); see United States v. Jarabek, 726 F.2d 889, 900 (1st Cir. 1984) (holding that the "mere involvement" of state officers in a federal investigation "is not sufficient reason to look to state law to determine the admissibility of interception evidence"). "Evidence obtained in violation of neither the Constitution nor federal law is admissible in federal court proceedings without regard to state law." United States v. Charles, 213 F.3d 10, 19 (1st Cir. 2000) (quoting Sutherland, 929 F.2d at 769); see United States v. Sheehan, 70 F.4th 36, 47 (1st Cir. 2023) (recognizing that "[e]vidence obtained by state officials while investigating a violation of state law is admissible in federal proceedings if it is obtained in conformity with the Constitution").[3]

---

[2] At oral argument, Rodriguez-Garcia's counsel argued for the first time that stopping a vehicle registered in Massachusetts pursuant to a Connecticut statute (regarding window tint) violates the Commerce Clause of the United States Constitution. Beyond this assertion, however, this argument was not developed further. Counsel's argument is unclear and because it was not raised or developed in his briefing, the Court does not reach it. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990); see Robinson v. Nat'l Student Clearinghouse, 14 F.4th 56, 60 (1st Cir. 2021).

[3] The First Circuit has suggested that a federal court may exercise its supervisory power to exclude evidence in "an extreme case of flagrant abuse of the law by state officials, where federal officials seek to capitalize on that abuse." United States v. Sutherland, 929 F.2d 765, 770 (1st Cir.

7

Other circuits take a similar approach. See, e.g., United States v. Scopo, 19 F.3d 777, 785 (2d Cir. 1994) (holding that "[w]hether a search and seizure is constitutional under the circumstances of a particular case . . . is determined by applying federal law"); United States v. Rickus, 737 F.2d 360, 363 (3d Cir. 1984) (explaining that "federal district courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law"); United States v. Singer, 943 F.2d 758, 761 (7th Cir. 1991) (noting that "[w]hether the evidence in the case was seized in contravention of the constitution or laws of the state of Wisconsin does not control its admissibility in federal criminal proceedings"); United States v. Chavez-Vernaza, 844 F.2d 1368, 1374 (9th Cir. 1987) (agreeing "with the Second and Third Circuits that requiring federal district courts to look to state law when determining the admissibility of evidence obtained in accordance with federal law would hamper the enforcement of valid federal laws and undermine the policy favoring uniformity of federal evidentiary standards"); United States v. Butera, 677 F.2d 1376, 1380 (11th Cir. 1982) (concluding that "complaints that the evidence was obtained in violation of state law are of no effect").

Here, Rodriguez-Garcia faces federal charges in federal court, D. 19, and seeks the suppression of evidence to preclude its admission in a federal criminal trial. D. 281. Federal law, therefore, governs and his state law arguments do not merit this Court's consideration in deciding the motion to suppress.

---

1991). The First Circuit has also noted, however, that there is no exception "to the general rule that federal law governs in federal prosecutions." Id. at 770. Rodriguez-Garcia has not argued, and the Court has not otherwise determined, any basis to conclude that the investigation by Trooper Brown or other officers of the CSP reflected such an extreme case. As discussed below, the officers acted reasonably in light of the information they had and there is also no record evidence indicating that the federal agents who coordinated the traffic stop did so to capitalize on some flagrant abuse of the law.

### B. The Stop and Search of the Corolla Was Reasonable

Rodriguez-Garcia argues that the warrantless stop and search of the Corolla were unreasonable in violation of the Fourth Amendment. D. 288 at 4–8, 12. The Fourth Amendment warrant requirement is "subject only to a few specifically established and well delineated exceptions." Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971). One such exception, applicable here, is the "automobile exception." Under the automobile exception, "police officers may seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband." United States v. Dion, 859 F.3d 114, 131 (1st Cir. 2017) (quoting United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014)). "Probable cause exists when the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found." Dion, 859 F.3d at 131–32 (citation and internal quotation marks omitted). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision." Florida v. Harris, 568 U.S. 237, 243–44 (2013) (alteration in original and internal citation and quotation marks omitted).

The government presents two discrete theories supporting probable cause. The government first urges the Court to impute the "collective knowledge" of the DEA agents involved in the investigation to the CSP officers who stopped and searched the Corolla. D. 302 at 9–13. The government alternatively argues that the stop and search were reasonable based on the CSP officers' personal observations. Id. at 14–15.

*1.    The CSP Officers Had Probable Cause Under the Collective Knowledge Doctrine*

Under the so-called "collective knowledge doctrine," courts may determine that probable cause exists based on "the collective information known to the law enforcement officers participating in the investigation rather than isolate the information known by the individual arresting officer." United States v. Balser, 70 F.4th 613, 619 (1st Cir. 2023) (quoting United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017)). The First Circuit has recognized two categories of collective knowledge. Id. The first category of "vertical collective knowledge" allows imputation of probable cause to an arresting officer where "a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest." Id. (emphasis in original) (quoting United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997)). The second category of "horizontal collective knowledge" allows the court to pool or aggregate "information available to . . . all the officers involved in the investigation" in the absence of a directive. Id. (quoting United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999)).

Whereas vertical collective knowledge has "sparked little controversy," federal and state courts "are split over how broadly to apply the horizontal outgrowth of the collective knowledge doctrine." Id. at 620 (quoting Commonwealth v. Privette, 491 Mass. 501, 509 (2023)). As recently noted, the case law of this circuit "has yet to squarely address the 'maximum' reach of the so-called horizontal collective knowledge doctrine." Id.; compare United States v. Verdugo, 617 F.3d 565, 573 (1st Cir. 2010) (concluding that an officer "clearly had probable cause" to search a truck for a cell phone used to coordinate drug transactions where the "the agents working with him had intercepted multiple cell phone calls and corroborated those calls with surveillance") with United States v. Cook, 277 F.3d 82, 86 (1st Cir. 2002) (limiting the pooling of collective knowledge to

10

"officers present at the scene and directly involved in effectuating a stop"). The Court need not opine on the "maximum reach" of horizontal collective knowledge here because the officers' stop and search of the vehicle was sufficiently directed to trigger application of vertical collective knowledge.

The First Circuit discussed vertical collective knowledge in Balser, 70 F.4th at 621–22. There, the court affirmed a district court's imputation of a DEA task force officer's knowledge stemming from a wiretap investigation where that officer asked a state police officer to initiate a traffic stop of a suspect vehicle. Id. In that case, a DEA task force officer on a drug trafficking investigation, reviewed and intercepted communications where the defendant had discussed and arranged a suspected drug transaction. Id. at 615–16. Based on the wiretap, the task force officer expected the defendant to be at location in Lawrence, Massachusetts for a drug transaction and informed DEA agents on the ground of the same. Id. at 616. Agents located a white Hyundai Sonata with Vermont plates registered to the defendant and followed the vehicle as it drove onto Interstate 93 North; agents then asked the task force officer "to request that a marked, uniformed police officer be dispatched to stop [defendant's] car on the highway." Id. The task force officer called a New Hampshire police officer and told him "there was a Title III wiretap as part of an ongoing drug investigation, that the car had been in Lawrence to complete a drug transaction, that the car was now driving north on I-93 toward Vermont, and that there were suspected drugs inside." Id. The officer used that information to locate the Hyundai Sonata and upon observing a traffic violation, stopped the vehicle. Id. at 617.

After weighing these circumstances, the First Circuit concluded that Turner's directive to DiChiara was "sufficient to impute [task force officer's] probable cause to [state police officer]." Id. at 621. The First Circuit reasoned that the task force officer had called the New Hampshire

11

officer and informed him "the DEA was up on a wire, that an individual (Balser) had ordered drugs and completed his purchase, and that he then left the Lawrence, Massachusetts area headed up I-93 North with drugs in his car."  Id.  Citing the decisions of other circuits, the First Circuit explained that the task force officer's information-sharing with state officer along with his request for a traffic stop constituted a sufficient directive to apply vertical collective knowledge.  Id. at 622; United States v. Chavez, 534 F.3d 1338, 1345–46 (10th Cir. 2008) (citing decisions from the Third, Fifth, Seventh, Eighth, and Ninth Circuits and concluding that "a police officer may rely on the instructions of the DEA (or other law enforcement agencies) in stopping a car, even if that officer himself or herself is not privy to all the facts amounting to probable cause").

      The similarities between the facts of Balser and the instant case are instructive.  Like the DEA agents and task force officer in that case, the DEA agents here obtained information through a wiretap investigation that reasonably led them to conclude that Rodriguez-Garcia had contraband (namely, drug proceeds) in his vehicle as he drove on an interstate highway.  D. 302-7 ¶ 4.  The agents then similarly requested that state police officers initiate a traffic stop of the vehicle, providing the officers with the same sort of information that the task force officer provided to the state officer in Balser, that is, the suspect vehicle's make and model, the likely presence of evidence of a crime within the vehicle based on information obtained in a wiretap investigation and the vehicle's direction and location to guide officers appropriately.  Id.  Trooper Brown then relied upon this information to find the suspect vehicle, observed a traffic violation and initiated a traffic stop.  Id. ¶ 5. Thus, the DEA agents involved in the broader investigation of Rodriguez-Garcia sufficiently directed Trooper Brown and the CSP officers effectuating the stop, so as to impute probable cause to stop and search the Corolla for contraband—which was based on the intercepted communications between Rodriguez-Garcia and Liu-Torres and the physical

surveillance of Rodriguez-Garcia's residence where he was spotted placing a red gift bag into the trunk of the Corolla. See 302-1; 302-2 at 2–3.[4] Because the CSP officers had probable cause to stop and search the vehicle for the drug proceeds, a warrant was not required under the automobile exception to render the stop and search reasonable.

> 2. *The Scope of Trooper Brown's Stop and Search of the Corolla Was Also Reasonable*

Given the collective knowledge imputed to the CSP officers, the scope and length of the search of the vehicle was also reasonable. The scope of a warrantless search of an automobile "is defined by the object of the search and the places in which there is probable cause to believe that it may be found." United States v. Ross, 456 U.S. 798, 824 (1982). "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." United States v. Mott-Frye, 251 F. Supp. 3d 310, 316 (D. Mass. 2017) (quoting Rodriguez v. United States, 575 U.S. 348, 350 (2015)).

---

[4] Even assuming *arguendo* that the collective knowledge doctrine does not apply, the CSP officers had an independent basis for the stop as the government also argues. Trooper Brown "observed that the vehicle had heavy tint on all four of the vehicle's door windows, including the driver and front seat passenger windows." D. 302-7 ¶ 5. The operation of a motor vehicle with window tint without a permit is a traffic violation in Connecticut, see Conn. Gen. Stat. § 14-99g(g); thus, at a minimum, Trooper Brown's initial stop of the Corolla was reasonable. See Whren v. United States, 517 U.S. 806, 810 (1996) (holding that a warrantless traffic stop is reasonable if the officer has "probable cause to believe that a traffic violation has occurred"); United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) (holding that "[a]n officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else"); see also United States v. Cruz Rivera, 14 F.4th 32, 43 (1st Cir. 2021) (noting that a traffic stop can be reasonably extended where there is reasonable suspicion of further criminal wrongdoing).

Rodriguez-Garcia's affidavit does negate the reasonableness of the stop even on this basis. Rodriguez-Garcia attests that once Trooper Brown told him about the window tint, Rodriguez-Garcia responded that "it was original," apparently an expression of skepticism that the tint was illegal. D. 281-1 ¶ 4. Trooper Brown acknowledges same in his declaration, stating that Rodriguez-Garcia "explained that he believed the tint on the windows was not darker than the legal limit," D. 302-7 ¶ 7. Even crediting such subjective belief (and putting aside that Rodriguez-Garcia later plead guilty on the citation for same and paid the fine, D. 302-5 at 1) does not undermine that the trooper had probable cause to believe that the heavy tint violated state law.

Once Trooper Brown stopped the Corolla based upon the collective knowledge of the agents and the observation of the window tint, he had ample authority to approach the passenger side and obtain the driver's license and registration to confirm that the driver was Rodriguez-Garcia, who had earlier been surveilled by the DEA agents and who was suspected of transporting drug proceeds. See Rodriguez, 575 U.S. at 349 (explaining that an officer has the authority to check the driver's license and inspect the vehicle's registration in the traffic stop context). Trooper Brown then smelled a strong odor of marijuana emanating from the vehicle and one of the passengers subsequently confirmed that there was marijuana in the vehicle. See Gov't Exh. 3 at 05:35–05:41; see also D. 281-2 ¶ 3. With the knowledge that the Corolla likely contained both drug proceeds (and, now, marijuana), the CSP officers reasonably instructed Rodriguez-Garcia and Velez to exit the vehicle, Gov't Exh. 3 at 05:44–05:56, so that Trooper Brown could search the passenger compartment, where he found two bags containing a small amount of marijuana and a metal marijuana grinder in the center console. See United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011) (explaining that an officer may order occupants out of a vehicle during a stop).

Finding no drug proceeds in the passenger compartment, Trooper Brown had probable cause to extend his search to the trunk of the Corolla, where $57,500 in cash was found in a red gift bag and seized. See Ross, 456 U.S. at 824 (explaining that the "scope of a warrantless search of an automobile . . . is not defined by the nature of the container in which the contraband is secreted" but by the "object of the search"). Rodriguez-Garcia also told Trooper Brown that there was additional cash in a compartment by the steering wheel, which the trooper then also seized. See D. 302-7 ¶ 14. After about twenty minutes, once the CSP officers concluded their search of the Corolla, Rodriguez-Garcia and Velez were permitted to return to the vehicle and the officers spent the remainder of the stop preparing and issuing traffic citations and a receipt for the

14

seized cash, consistent with the reasonable time needed to handle the matters for which the stop was made. For all of these reasons, the scope of the stop and search of Rodriguez-Garcia's motor vehicle was reasonable and not in violation of the Fourth Amendment.

### C. Rodriguez-Garcia's Statements Should Not Be Suppressed Under Miranda

Rodriguez-Garcia argues that his statements to the CSP officers should be suppressed because he was in custody at the time and did not receive Miranda warnings. D. 288 at 8–12. "Incriminating statements obtained during a custodial interrogation, where 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way,' must be excluded from criminal prosecutions unless a defendant has waived the Fifth Amendment privilege after being warned of the right to remain silent." United States v. Cruz-Rivera, 14 F.4th 32, 47 (1st Cir. 2021) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). "The custodial inquiry is an 'objective, suspect-focused' examination that is 'informed by our assessment of the reasonableness of the detaining officer['s] . . . actions in response to developing conditions.'" Id. (alteration in original) (citation omitted).

The court's task is "to determine whether the facts of a specific case indicate a situation more akin to a routine traffic stop, at which Miranda warnings are not required," or indicate that detention had escalated such that "a suspect has been 'subjected to restraints comparable to those associated with a formal arrest,' at which point Miranda warnings are required." Id. at 48 (quoting Berkemer v. McCarty, 468 U.S. 420, 441 (1984)). The custody analysis is a two-step inquiry. First, the Court must first "ascertain whether . . . a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Id. (alteration in original) (quoting Howes v. Fields, 565 U.S. 499, 509 (2012)). Relevant factors include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers

15

present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Id. (quoting United States v. Melo, 954 F.3d 334, 340 (1st Cir. 2020)). "[N]o single element dictates the outcome of this analysis." United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999).

"[A] suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of Miranda." United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010); see Melo, 954 F.3d at 340 (noting that "whether an individual's freedom was curtailed" is just "the first step in the analysis, not the last") (quoting Howes, 565 U.S. at 509). The second step of the analysis raises "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Cruz-Rivera, 14 F.4th at 50 (quoting Melo, 954 F.3d at 340). "The focus here is whether a person would reasonably find the circumstances coercive enough that the concern that drove Miranda comes into play, United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010), i.e., whether there is enough pressure on a person to sufficiently impair his free exercise of his privilege against self-incrimination." Cruz-Rivera, 14 F.4th at 50. "This inquiry is the crux of [the court's] analysis because Miranda 'does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.'" Id. (quoting Minnesota v. Murphy, 465 U.S. 420, 430 (1984)).

Turning to the step one of the analysis, here, the Court first considers whether the questioning took place in familiar or at least neutral surroundings. The First Circuit has described highways as "neutral." See, e.g., Jones, 187 F.3d at 218 (describing a "public highway" as a "neutral setting that police officers are not in a position to dominate as they are, for example, an interrogation room at a jailhouse"). The First Circuit has also emphasized, however, that the fact

16

"that a highway is not per se police-dominated in the same way that the interrogation room in a station house is does not mean that it is per se neutral." Cruz-Rivera, 14 F.4th at 49. "Where, as here, the police are controlling the situation the neutrality of the site is arguably brought into question." Id.

As to the second factor—whether the number of officers present at the scene was excessive—Rodriguez-Garcia faced questions primarily from Trooper Brown during the encounter. See Gov't Exh. 3. Another officer asked Rodriguez-Garcia a few questions when Trooper Brown found the red gift bag containing the $57,500 in cash in the trunk, see id. at 10:42, but this interaction did not render the officer presence excessive. See United States v. Crooker, 688 F.3d 1, 12 (1st Cir. 2012) (holding that a defendant was not in custody where, among other factors, "no more than two agents were in direct conversation with Crooker at one time").

As to the third factor of physical restraints, at no point was Rodriguez-Garcia placed in handcuffs or in the police cruiser. See D. 302-7 ¶ 11. Instead, Trooper Brown instructed him to sit on the ground in front of the police cruiser. D. 281-1 ¶ 7; id. Although another officer stood near Rodriguez-Garcia while Trooper Brown searched the vehicle, any restraint here were minimal. See Cruz-Rivera, 14 F.4th at 49 (noting that physical restraint was "arguably inconsequential" where statements were made before the suspect was placed in the police cruiser).

The final factor—the duration and character of interrogation—also weighs against a determination of custody. Trooper Brown questioned Rodriguez-Garcia intermittently, not as part of a comprehensive interview. Any relevant questioning occurred during the initial stop and search, which lasted approximately twenty minutes.[5] Gov't Exh. 3 at 01:22–22:08; see Cruz-

---

[5] After the initial stop and seizure, Rodriguez-Garcia and Velez were permitted to return to their vehicles, where they remained for about half an hour while the officers prepared the citations and a receipt as to the $57,673 in cash that was seized. Gov't Exh. 3 at 22:08–49:20.

17

Rivera, 14 F.4th at 50 (noting that "duration was not excessive" where "questioning was complete just over a half-hour after the initiation of the stop (regardless of the longer duration of the stop in its entirety)"); United States v. Hughes, 640 F.3d 428, 437 (1st Cir. 2011) (concluding that a ninety-minute interview was "relatively short" and weighed against a determination of custody). There is also no indication that Trooper Brown or any of the other officers acted with hostility toward Rodriguez-Garcia or Velez. See Cruz-Rivera, 14 F.4th at 50. Rodriguez-Garcia confirmed the same in a subsequent call with Liu-Torres. D. 302-1 at 13.

In sum, the relevant factors as to the "first step" of the custody analysis, id. at 48, support the conclusion that Rodriguez-Garcia was not in custody.[6] Based on the totality of the circumstances surrounding the initial stop and search of the Corolla, the officers' intermittent questioning over a roughly twenty minute period "lacked the coercive element necessary to convert it into something more draconian" as required for the second step of the analysis. United States v. Fornia-Castillo, 408 F.3d 52, 64-65 (1st Cir. 2005) (quoting United States v. Lee, 317 F.3d 26, 32 (1st Cir. 2003)). For all of these reasons, suppression of Rodriguez-Garcia's statements is not warranted.

---

[6] Rodriguez-Garcia asserts in his affidavit that he did not believe he was free to leave. D. 281-1 ¶ 7. The First Circuit has explained, however, that the determination of custody is "based on the objective circumstances surrounding the interrogation," i.e., whether "a reasonable person would have felt free to terminate the interrogation and leave." United States v. Monson, 72 F.4th 1, 10 (1st Cir. 2023). Thus, Rodriguez-Garcia's subjective belief does not change the custody analysis. See id. (holding that the totality of the circumstances "are to be evaluated objectively, 'not [based] on the subjective views harbored by either the interrogating officers or the person being questioned'" (alteration in original) (quoting Stansbury v. California, 511 U.S. 318, 323 (1994))).

D.      **The Officers Reasonably Seized the $57,673 in Cash**

Rodriguez-Garcia also contends that the warrantless seizure of the $57,673 in cash was unreasonable under the Fourth Amendment.[7]  The Court has already discussed how "[u]nder the 'automobile exception' to the Fourth Amendment, police officers may seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband."  United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014).  "[W]hen federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband."  Florida v. White, 526 U.S. 559, 563–64 (1999).  In light of the Court's conclusion that the DEA agents' probable cause may be imputed to Trooper Brown and the CSP officers, the officers had ample basis to suspect the cash in the vehicle were proceeds from illegal drug transactions.  The seizure of such evidence was not unreasonable.

E.      **An Evidentiary Hearing Is Not Warranted**

Rodriguez-Garcia requested an evidentiary hearing on the motion to suppress.  D. 281 at 3.  "[A] criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion."  United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010) (quoting

---

[7] In addition, Rodriguez-Garcia contends that the seizure of the cash constitutes "an excessive fine, in violation of the Eighth Amendment to the United States Constitution, as incorporated by the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution."  D. 288 at 13.  "The Excessive Fines Clause . . . 'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.'"  United States v. Bajakajian, 524 U.S. 321, 328 (1998) (quoting Austin v. United States, 509 U.S. 602, 609–10 (1993)).  At this stage of the proceedings, the factual question of Rodriguez-Garcia's guilt or innocence—which necessarily precedes the question of whether punishment or forfeiture is warranted—has yet to be determined.  The $57,673 has been seized as evidence of a suspected crime, not extracted as punishment.  Rodriguez-Garcia's appeal to the Excessive Fines Clause of the Eighth Amendment is therefore unavailing.  See United States v. Jose, 499 F.3d 105, 111 (1st Cir. 2007) (analyzing whether the "forfeiture order," not the initial seizure of evidence, constituted an excessive fine).

United States v. Panitz, 907 F.2d 1267, 1273 (1st Cir. 1990)). Evidentiary hearings are only required where the defendant makes a sufficient showing that a warrantless search has occurred. United States v. Lewis, 40 F.3d 1325, 1332 (1st Cir. 1994). A sufficient showing is made where the defendant alleges facts sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented. Brown, 621 F.3d at 57. "Most importantly, the defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." Id. at 57–58 (quoting United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996)).

Here, Rodriguez-Garcia has not shown that there are factual disputes which, if resolved in his favor, would entitle him to the suppression of the seized evidence or his statements if resolved in his favor. As to the initial stop, Rodriguez-Garcia attests that after Trooper Brown explained the basis of the stop was the heavy tint of the Corolla's windows, he responded that "it was original." D. 281-1 ¶ 4. As discussed above, it is not clear how this assertion refutes the officer's probable cause to believe that the tint was not allowed under Connecticut law. Even assuming *arguendo* that it did, such assertion would not alter the conclusion that the collective knowledge of the DEA agents may be imputed to the troopers involved in the stop and search as addressed above. Accordingly, discerning no other factual disputes between the parties, an evidentiary hearing is not warranted. Rodriguez-Garcia's request, therefore, is denied, D. 281 at 3.

**V.      Conclusion**

For the foregoing reasons, the Court DENIES Rodriguez-Garcia's motion to suppress, D. 281.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge